22-1156. And I understand, Attorney Tauber, you're going to be leading off for us and that you would like to reserve two minutes for rebuttal. Is that right? Yes. So you can please proceed whenever you're ready. How's the, how's this? Beautiful. Yes? Okay. Good morning. Thank you, Your Honors. My name is Miriam Tauber, and I am the Attorney General of the U.S. Supreme Court. I'm here to present the plaintiff's stockholders in this 16B case. 10% shareholders are subject to insider trading restrictions under 16B because they are presumed to have a cozy relationship with management, giving them superior access to non-public information and influence over corporate affairs. The unorthodox transaction exemption district liability under 16B, upheld by the Supreme Court in 1973 in Kern County, was developed in this court in the context of a hostile takeover. There were two reasons given for the development of the doctrine in that context. The first is the insider attempting a hostile takeover was antagonistic to the company, which is the antithesis of the cozy relationship the statute presumes. The second, the transaction in that case was a defensive merger taken in response to the takeover attempt, which the insider voted against, challenged in court, and lost, so that the only real alternative to the transaction was for the insider to sell his shares before the transaction and incur short-swing trading liability anyway. In that respect, a 16B transaction was forced on the insider and thus involuntary. The unorthodox transaction doctrine has expanded beyond this context, but these two requirements remain the fundamental requirements of the exemption, which are number one, does the insider have the potential to access non-public information, i.e., is there a potential for speculative abuse? And number two... ...was public information and therefore could not be a problem. Do you want to respond to that? Yes, Your Honor, thank you. First of all, we only have him saying that he only got non-public information, and there have been cases, I think cited in our brief, where the insider's self-serving testimony that he didn't get any non-public information isn't enough in this context to show that he didn't have the potential to access that information. Many cases... You mean just the phone call itself, by making that phone call, that was enough? Well, it's not just... It's not just the phone call. It's the fact that he was in a position to be able to pick up the phone and call the CFO of these companies... And have him answer. And have him answer and not have to wait. That's enough. I mean, you know, it wouldn't depend upon anything that was said or... I mean, he takes the position that Pendo was just basically reciting what was in the public documents. And if that's the case, where's the evidence that any... Well, I would say, you know, first of all, the actual... Are you sure about the merger date? And that was the... Pendo said, yeah, that's the date. And we're not going to shift from that. I'm sorry, are you sure about the merger date was your example? The date of the merger. Okay. Yeah. It's totally public information. Right. Under those circumstances, you would still be arguing for liability? Well, that isn't exactly what we have in this case. Oh, I understand. Right. In this case, I think it's... One important fact is that the thing he actually said they discussed was the merger pricing, which I think is a key term of the transaction. And in this case, the two companies that are being merged were investment funds. We invested in non-public assets. So the merger pricing is not something that could be discerned from public filings of public companies and really required judgment of the CFO to decide how these relative values would be calculated. Can you point to specific insider information that you would rely on in trial? Well, I don't have... This brings me to my second point, which is that I don't have that information. But 16B is a strict liability statute and a remedial statute. And even though the unorthodox transaction is in play here because it is a merger, not a market cash-for-stock transaction, every time you raise an unorthodox transaction defense or an unorthodox transaction occurs, it doesn't transform 16B into a 10B-5 cause of action where a plaintiff is now required to actually demonstrate that insider information was exchanged. But the district judge here said that it was speculative and it was... You know, the claim was speculative, that there was insider information exchanged. And you're saying that speculative or not, it doesn't matter. Well, I'm saying... As long as there's a potential for it. Well, I would point out that in every unorthodox transaction case before this court, there has been facts that tend to suggest that the insider was antagonistic or hostile to the company. Is that a requirement? I understand that you may be looking at fact patterns of previous cases. But have we ever articulated that that's a requirement? I don't think we have. I mean, just tell me, have we articulated that or not? So I would say that in the case of HUP versus WPCS, there is a passage that says, you know, the unorthodox transaction exemption is not intended to apply to a garden variety insider. Okay, but we've laid out elements, right? I mean, we've said, one, an involuntary transaction by an insider. Two, having no access to insider information are prerequisites to use of the Kern County analysis. That's from HUP, right? So we've laid out elements. Are you saying there's an additional element? Well, no, I'm saying that access to insider information, that the basis for this problem of the analysis comes from the hostile takeover context. No, I understand. Are you then saying that it's not enough to satisfy or not satisfy those two elements? Are you saying it also has to happen? I'm not saying that, Your Honor. I'm saying that as part of the second element, this access to information element, or maybe you call it the first element, you need to evaluate the context, the relationship. Is this relationship between the insider and a management closer to a hostile relationship or is it closer to a cozy relationship? And why? Because that demonstrates access or lack of access? Because the point of the reason the statute applies to 10% owners is because the statute presumes they are in a position of greater access than the average shareholder. So, again, just to clarify, are you making this point to suggest that if there's not a hostile takeover situation, that's going to bear on whether there is or is not access? I would say that if there's not a hostile takeover situation, well, I would say that it's the defendant's burden in the first instance to prove that there's no potential for access. I think that is what's sort of being lost in this conversation. It's not the plaintiff's burden to prove that there was access. No, I get it, but why are you bringing up the hostile takeover? I guess I'm just asking, is this simply a common fact pattern that you're reciting? The reason I'm bringing that up is because the way that's usually established by defendants is to show this is a hostile situation. But you're not suggesting that's the only factual context in which it can be shown, right? Correct. In this situation, not only do we not have that, we don't have any facts indicating any hostility, and not only that, we have facts to show that they actually were on good terms. Well, let me ask you this, then. It seems to me that the only fact that's at play here in terms of access is the Pendo call, right? Well, no. I mean, I think the context of the Pendo call is important. Tanenbaum, Mr. Tanenbaum, had founded and previously managed these two companies that merged before selling them to Oak Tree, this other company. He was the consolidated insider before this time. After the sale, he testified that he frequently would call them to ask for voting instructions, even though the agreement was very clear that he didn't have to act. I didn't have to do that, and he could vote however he wanted. But he wasn't forbidden from doing it, either. No. He was contractually bound to follow their voting instructions. But he's not contractually bound to ask for voting instructions. But he's also not contractually prohibited. Correct. Asking for voting instructions, are you suggesting that asking, hey, are you invoking that my contractual obligations is somehow asking for inside information? No, not at all. I'm suggesting that that goes to more the context of their relationship and showing that far from being hostile, they were on good terms. Okay. So let me back up to something you said way at the beginning. You said that it's not about access but potential access. Is there a case where we've said that? I thought that the question was potential or possibility of speculative abuse of inside information. So I thought that to the extent we're talking about the potential or speculation, we're talking about the abuse, not so much whether someone might potentially have access to information. Because if that's true, anyone potentially has access to information. I mean, I potentially have access to information, right? You don't know. Maybe I know these people, potentially. Sure. So where does the potential access come from? Can you give me a case? Well, yes, I think in the Makovsky case versus Ultradynamics and also in, I believe, in the Hub case as well. Hub talked about potential access? I believe so. Let me just get the quote. It says, you know, even though there are, I mean, I think it was Hub. I'm not going to. No, please, take your time. It's okay. There is a case where they say even though the defendant says he didn't get any non-public information, the question is not whether he actually did. The question is whether he could have. That is the test, whether he has access to it. Even though he's saying he didn't, he didn't look at it, he could have looked at it, right? I'm going to find that quote in one moment. If you give me a minute or I can do it in rebuttal. That's fine. Don't worry about the red light right now. Take your time. Oh, thank you. I appreciate it. We've only got two cases being argued today, so we need to earn our keep up here. We're going to have lunch at a reasonable hour. Okay. Well, and also what I will say is if you're just looking for a citation, you can come back to that in rebuttal. And we can just deal with the argument that we've got. I don't know. The other thing I want to just say to the point you raised about, like, how do you know? I don't have access. I might know these people. The statute applies to statutory insiders only. So if you're a 10% shareholder, then you have to worry about that. But if you're an average 1% shareholder, you don't have to worry that the fact that you might know these people gives you a presumption of access. It doesn't. The statute says if you're a 10% shareholder, at that threshold, if you know these people, that's presumption of access. Because not only are you a 10% shareholder, but you also have no access. But that presumption of access, and I get that, why there would be a presumption that if you have that kind of interest in the company, we presume you have access. But it's a rebuttable presumption, right? But is it rebuttable just by saying, well, he didn't tell me anything? Okay, well, let's just take it seven at a time. Which is essentially what's going on. So number one, it is rebuttable, correct, through some quantum of evidence. But your position, is it that your position that simply on this record, it has not been rebutted? My position is that the court, this court, has seemed to require, in order to rebut that presumption, a high level of evidence to rebut it. Meaning hostility, antagonism, something that actually shows that the company would be guarded and not share information with the insider. So even if you have sworn testimony saying, more than just that you didn't tell me, but I'll tell you what conversations I did have. We talked about this and that and this and that, but not the other thing, that can't rebut it? Well, I will say that there is one case in the Fourth Circuit in which an insider who was not hostile was still held to have the benefit of the unorthodox transaction exemption. In that case, the emphasis was on the fulsomeness of the disclosures. And the court emphasized that there was a proxy statement where this insider had said that he had committed to voting for the transaction. And also he wasn't, you know, he was an independent director. He wasn't a management director. In this case, I would just point out that disclosure was not that fulsome. The voting agreements were disclosed, which said that Oak Tree had the right to give written instructions. But the fact that Mr. Tannenbaum had actually committed to voting for this particular transaction was not disclosed, even when the vote was submitted. And that's certainly not going to be surprising to the public, that they would instruct him to vote in favor of the merger that they had publicly announced? That that's going to be a shock to the public? Oh, my gosh, the company wants their proposal to go through? Of course they wanted to go through. They had a recommendation. And isn't that sort of obvious? If you saw the voting agreement and you know that the company can drive the bus here, you're going to be surprised that they turned the bus on and drove it? Respectfully, I think there is a, first of all, it surprises me that the voting agreements require written instructions in the first place. I mean, it seems to me it could be easier done by just saying, Mr. Tannenbaum gives management his irrevocable proxy for all time. Here, take my vote and vote. Why does he need written instructions to buy into his vote on anything? Well, why not? I mean, I guess I'm not sure how that's material. That sort of makes it seem like there is a reason why they would want him to sometimes vote independently. Maybe it's to give comfort to minority shareholders that this is not being forced upon you. Your old manager, Mr. Tannenbaum, who you invested with before the company was sold to us, voted independently. Or, you know, not to spook the shareholders with some of the voting agreements at a sale that Mr. Tannenbaum is now abandoning ship and will not have any involvement. Right? Maybe at that point they wanted shareholders to have the impression that Mr. Tannenbaum would continue to exercise discretion unless there were written instructions. And I would argue there's an expectation that any written instructions would be disclosed. They have to be in writing.  I guess I'm not sure how why not translates into that there would be an expectation that it must. Those are two different things, right? One is, why not? I mean, sure, they could. They couldn't. They could disclose whatever they wanted. How does that translate into that there would be a reasonable expectation on the part of shareholders that that would, of course, be done? That's a very different proposition, right? So, two responses. One is that time of the actual initial disclosure of the voting agreements, they did emphasize the one written instruction that it contained. So they separately pointed out to shareholders and said, and by the way, we are issuing our first written instruction, and it's this. It's to vote for this actual transaction. I have a question. Do you take exception to the idea that they, at the phone call, that Pendo and Tannenbaum discussed only information that was public? The truth is I don't know what was discussed, and I don't believe that it's plaintiff's burden to establish what was discussed. I think that it's defendant's burden to establish there was no chance that he could have conveyed anything on public data. Well, don't both Pendo and Tannenbaum say that they just discussed public information? Sure. There's not only evidence there, so it may have been something else. Well, no, Mr. Pendo hasn't said anything. He hasn't been deposed. He hasn't submitted an affidavit, so we don't know. It's just Tannenbaum. Right, it's just Mr. Tannenbaum. And second of all, you know, again, the whole point of 16b is that a plaintiff doesn't have to prove that nonpublic information was used, shared, accessed, that there's a presumption that if you cross this threshold, you are equivalent to a director or an officer in terms of your access and influence. If you want to rebut that presumption, you can rebut it. I would suggest that the way to rebut it is not by saying, yes, yes, we had a lot of private phone calls about voting instructions, about this merger, about other things, but don't worry. We never got any nonpublic information. We just met for dinner. We had, you know, drinks, whatever it was. So how could anyone ever rebut it? By showing, look, I was hostile, first of all, at the very least, right? We agree. Okay, so let me ask you this. By showing more hostile, right. In your view, could anyone who's not in a hostile relationship ever rebut it? Well, so. Ever prove a negative? I would say that. That the conversation was not had. Otherwise, it seems impossible. Because even if you said, oh, well, I was at these six public meetings with these 17, you know, impartial witnesses, and they'll all attest that nothing was ever discussed involving inside information, you can always say, oh, yeah, but you had a cozy relationship. Maybe you had secret phone calls. So in that situation, I think you seem to be suggesting that unless there's a hostile relationship, the presumption can, by definition, never be rebutted. How is that? Is that the logical consequence of your argument, or is it not, and why not? Well, so just, I guess, for one, we don't have that fact here. That's why I love to ask different hypotheticals. Right. We do have an admitted private conversation. Well, the reason I'm asking is, you know, if we were to rule for you, we would have to articulate some sort of general rule or rule of general applicability, and we'd need to know what the consequences might be in other cases. So if you could just take my hypothetical on its own terms. Right. I mean, I would say 16B is a stick-by-ability statute. It's really not meant to be rebutted. It's meant to be. It's not meant to be rebutted. It's meant to be if you reach the threshold or if you're a director officer, right, then just don't engage in short-spring trading. But I thought we already established. I'm sorry. I thought we already established that it is a rebuttable presumption. Are you telling me it's not a rebuttable presumption? Well, I'm saying outside of the unauthorized transaction context. That's what I'm saying. So let's back up. So are you, if I understand your position correctly, are you saying that outside of a hostile relationship situation, the presumption cannot be rebutted? I'm saying that the presumption. Well, no, I wouldn't go that far. I don't think I have to go that far in this case. So why not? And I'm not talking about this case. Well, because I think it would be rebutted, for example, by showing, okay, like in this Fourth Circuit case I was referencing where this case where there was no hostility but at the same time the exemption applied. And in that case we have an independent director who is not involved in any aspect of the transaction, right, didn't negotiate it, didn't sit in board meetings about it, didn't approve any aspect of it. And what he did was initially when the transaction was announced, in the proxy statement he had said, I am going to vote for it. I have committed my shares. I'm voting for it. I have no involvement. Months later the shareholders took their vote and they voted for it. So now that insider, I think a few facts in that situation are different. One, his vote was not dispositive. Unlike here, which I haven't even mentioned yet, but unlike here where the insider's vote actually made the transaction happen. Whether or not, you know, it was. So I guess. Well, the insider's here, the insider's vote was foreordained. All that was foreordained, right, assuming that you accept that there was no coercion or that it was involuntary. You know, once it's involuntary, it seems to me that anything that's said under these circumstances, how is it material that the vote is going to take place in the way that it did? Well, I want to just say that it's undisputed that the voting agreements themselves do not foreordain his vote. They don't require. Right. So it's only foreordained when you've got these instructions, this e-mailed instructions. So you might have violated the earlier agreements by voting against them. Is that your point? No, my point is that those instructions were only sent after the proxy was already distributed, right? The proxy was never amended. So shareholders never, if we agree and everyone in this room agrees, the voting agreements themselves don't require him to vote a certain way. Wait a minute. What do you mean by that? Well, the voting agreements say specifically he has the independent right to vote unless written instructions are issued on any specific proposal. Oh, so you're just saying that there could have been a world in which he didn't get written instructions. Right. I mean, the instructions in this case is a casual e-mail he had to ask for. So maybe if he didn't ask for it, he wouldn't have been given them. And, you know, I know that you had suggested and the court suggested this is too important of a transaction to imagine that he wouldn't have been instructed on it. But I would say there's a world of reasons why he might not have wanted to have written instructions issued by getting his vote, and it might be because he wanted to give the impression that there was an independent vote taken, that this projection was not being forced upon the shareholders strictly by the manager in charge, by issuing instructions that would then toss the vote in its favor. And that way it's a, you know, it seems like this is an independent shareholder vote. It also could be that because the vote was dispositive on the merger specifically, that they wanted to avoid issuing written instructions, and were using the instructions only for votes that to sort of push it over the edge or to, you know, for example, the merger consideration proposal. He had 13% of those shares as opposed to, I think, 21% of the acquired company's shares. So he may have used the instructions for the consideration, but not for the underlying proposal, to sort of give some credibility to the fact that the vote was independent on the merger itself. Or left them purposely vague so that the, you know, Mr. Tenenbaum could have voted that way and not read them too carefully, and that way if ever challenged, you could see that, you know, oh, it only says two proposals and not one proposal or whatever it is. I think we have kept you up considerably past your red light, and we thank you for that. You have reserved time for rebuttal. Unless there are any other questions right now, why don't we hear from your adversary, and we'll come back to you. You've held on to two minutes, so we'll see you again. Mr. Udall? It's Udall. Thank you, Your Honor. I'm Jeffrey Udall for defendant and appellant Leonard Tenenbaum. This court should affirm the district court below simply because Judge Engelmeyer correctly held that Mr. Tenenbaum's shares were exempt from liability under Section 16B because they qualified for the safe harbor of the unorthodox transaction doctrine, meaning both of the two elements of the doctrine, one, involuntariness, and two, no record evidence that the merger gave Mr. Tenenbaum any access to the potential for speculative abuse. I have a question on that score because I see that looking at Tenenbaum's testimony, that he said that Pendo stuck strictly to the script of public, whatever was in the public information, the phone call. But he wasn't there. The other guy was at the other end of the phone. We don't have Pendo's testimony. Correct. So, I mean, I can see why it would be in his interest to say that, but how could he know? That's one question. And then the second question is that Judge Engelmeyer focused on the, I think, in his analysis on this point, on the merger ratio between the two companies. But the question that was presented or that they discussed wasn't about the ratio. It was about the methodology of ascertaining the NAVs. And that has nothing to do with the ratio until later on you find out what the NAVs are. But he wanted to know, Tenenbaum wanted to know what the methodology was of, that the company was using now to figure out what the NAVs were. And he said later on in his deposition, oh, this is very complex. It's not something you could easily, you can't just look it up. You know, it's not like publicly traded stock, and some of the holdings are illiquid, and there's no market, and so you have to have a measure of that. So he says here, I spoke to Matt Pendo, and more specifically asked him how the NAV calculations were being calculated for the merger. And I wanted to try and ascertain if I was being hurt by this or benefited. And then he says he pointed towards different parts of the public release documents to walk me through how the NAV was being calculated. But, of course, he wasn't in the room at the time, so, you know, he's maybe assuming that. But the problem is that how the NAV is being calculated is in neither the 8K or the press release. It's only the ratio aspect of it that's important, but not how the NAV is being calculated. And I don't, but apparently he was satisfied. I think, I don't know if you were questioning, or who was questioning Mr. Tannenbaum at this point, but the questioner said, he explained to you how the NAV was being calculated. Did you understand, though, that the calculations were not final? He explained to me that the calculations weren't final. So he then, but I don't understand whether there was really any explicit testimony on how the NAV was being calculated, which was communicated to Tannenbaum. One could read this to say it must have happened, but I don't know. And, but then Judge Engelmeyer doesn't really talk about this. Your Honor, I think I can address it by starting where you just left off. What Judge Engelmeyer found was that there was, there is no potential for speculative abuse here based on that conversation. A couple things. One, as you pointed out, and Ms. Stauber mentioned in her address, there is no evidence of what Mr. Pendo said. They had the opportunity to call him, to pose him, try to get an affidavit from him. They did not. So the only record evidence we have is what Tannenbaum testified, which goes unrebutted. Now, to your question about the significance of his testimony, first thing you've got to keep in mind, and Judge Engelmeyer recognized this, that conversation was about five months before the actual closing of the merger. So for any, what we would need to show, they would need to show to overcome, or the presumption is that he had access. We, as Judge Engelmeyer, we submit correctly found, rebutted that presumption. And for them to sort of, you know, overcome the rebuttal, they would have to point to something that's not conjecture, that's not speculative, that he could have heard or learned from Pendo in that conversation, since there's nothing in the record. And what Judge Engelmeyer found in his, and noted in his decision, was that given the amount of time between that conversation, which was in October of 2020 and March of 2021, in other words, it's five months later until you have the merger. And what is the only possibility is what are the nabs five months later on the date of the, you know, 48 hours before the merger. There is no possibility of anything material. And it has to be material that he could have. It's not just to the colloquy that Your Honor, Judge Nardini had. Well, I'm going to play devil's advocate here and just say that, yes, you couldn't figure out what the nab was going to be five months later. Right. But you might get some information about whether the, about the methodology that's going to be used to determine that. But I think, Your Honor, and this goes to another part of your question, everything that was, those things were disclosed in the, in the fulsome public disclosures. And what Mr. Tannenbaum testified was that there was nothing else disclosed in that conversation that wasn't in the public record. And they have pointed to nothing that conceivably could have been. And, in fact, what they, you know, the question below, or the argument was raised below by plaintiff that, well, you know, the fact that he was such a, had such a cozy relationship with Oak Tree enabled him to make this phone call and get Mr. Pendo on the line. But, and so they say, well, you know, why would he have called him? Just the fact that he called him alone shows that he must have gotten something, you know, some inside information. Otherwise, why would he call? It's a little bit more than that, I think, in that he called him and asked for the method of calculating the nab. How is the nab going to be calculated? Not what the numbers are. The nab now is going to be different than all that's true. And then there's, his testimony was that he went through the public information. But the public information didn't deal with the method of calculating the nab. But there's nothing in, at least that I could find, I'm looking at the thing in the two documents. Yeah. The November 29th press release. Right. And the, and the 8K statement. That is not in there, anything about nab calculation. But there's nothing more, as Judge Inglemeyer found, we submit correctly, nothing more than sheer speculation and conjecture that could come up with something, anything, that five months earlier he could have told, Pendo could have told Tannebaum that could have been exploitable. Well, suppose they had a way of, just hypothetically, they had an expert come in and, or they would have a specialist come in and tell them what the value is of the non-marketable securities that they held or properties and assets that they held. And that, they would do that and also take a look at what the stock prices were of the ones they did hold. And maybe they would discount what the expert was saying. There may be a little way of thinking about this. And that is the same way that would be thought, would be the same methodology that would be used five months later. Judge Walker, I would respectfully submit that even if that were so, it's still not material. Because, as you noted, five months later, maybe they've gotten rid of these properties. Maybe intervening facts will happen. And within that five months, by the way, there was another disclosure. The phone call, the Pendo call happened after the first disclosure within a day or two. And then a couple of months later, in February, I believe it was, still a month before the transaction, they published, you know, new numbers. And, in fact, the ratio had changed by that time. And then it changed yet again finally within 48 hours of the final closing of the transaction. So all of these things show you that there was nothing even, and they have not pointed to anything that logically was exploitable. He might want to have done his own independent analysis based upon the methodology used to calculate the NAB by the companies. And that would be the argument, I guess, the other way. Your Honor's making the argument more articulately than has been made by the plaintiff appellant, I would submit. And the answer, though, Your Honor, is that even if that were the case, as a matter of law, we respectfully submit it's immaterial. That would have been immaterial due to the passage of time, the change of facts and circumstances. In other words, if this were an insider trading case, not a 16B case, I think you'd have a judgment for the defendant, as a matter of law, that it cannot be material to learn the kinds of things you're speculating. And that's because, I guess your argument is that that's because any methodology that was used for the NAB would be irrelevant until 48 hours before the transaction. Correct. Correct. And that's essentially what Judge Inglemeyer so held, is that it's unknowable, he said, anything that they would presume. Right. Not just the NAB, but also the methodology for finding out what the NAB was. Correct. If I may, I'd like to address a question that Judge Nardini asked of my adversary, which is, well, is there a third element here that they're adding onto the case, onto the safe harbor? And the answer is no, there are not three elements. There are two, involuntariness and potential for speculative abuse. And the critical thing about Kern, as held in Kern, and as well reiterated by this court and others applying it, is that it is a pragmatic approach. That is the whole point. So, you know, you have to look, facts, fact patterns are different. That's why judges give hypotheticals. But it's not an extra gloss or element, certainly, of the unorthodox transaction doctrine that it need to be with adverse parties in a hostile takeover. In fact, in the situation, that Fourth Circuit case that my adversary has been referencing, it's called Gold v. Sloan. In fact, the judge, the court in that case engaged in exactly this kind of pragmatic analysis, the Fourth Circuit did, and they separated the wheat from the chaff. And there were some people who they said did not have access to inside information, and therefore they were, some of those defendants were entitled to the benefit of the doctrine. There was one who was not so entitled. That was the one named Sloan himself. And why is that? Well, he had access to inside information. He sat on the board. He was, I think, he was an officer, president and CEO. He had the ability to change the course of events and learn, you know, have an insight into what the earnings were. That was the case in McCoskey, by the way, which was a Judge Lasker, I believe, opinion from this court or from the Southern District where, you know, the defendant there also, they had members on the board. And they had the ability to see or predict and get a little inside window into what future earnings would be. These are all the kinds of things that a classic insider can exploit to their advantage. That's the exact kind of evil that Section 16B was meant to prevent, that Congress in its wisdom meant it to prevent. But in turn, the court said, okay, but if you don't have the potential for those elements here, you know, the potential for speculative abuse, then the defendant is entitled to the benefit of the doctrine. And we would respectfully submit that for all those reasons on the speculative abuse problem, certainly Mr. Tannenbaum was entitled to the benefit of the doctrine. If I may, to just turn to the voluntariness. Sure, you can take another couple. Thank you. So their argument is that it wasn't voluntary because a couple things. One, as was discussed here, he asked for the instructions or whether there were instructions. So we submit that, as Judge Inglemeyer correctly put it, that's a non sequitur because the fact is he got instructions. He got explicit written instructions, and he was obligated legally contractually to follow those. By merely asking, hey, how do you want us to vote, they were only sensibly and prudently giving Oak Tree the opportunity to avail itself of its contractual right. And the contract sensibly says, the voting agreement, that they have to, if they are going to direct Mr. Tannenbaum, they have to do so in writing. Any lawyer or common sense knows that you say in writing to remove, you know, disputes, factual disputes about whether the instructions were given or what they were, et cetera. So that's what the contract sensibly required. And Mr. Tannenbaum not wanting to get caught in a, you know, he said, she said with what the instructions were sensibly and simply said, what are the instructions? That gives them five possibilities, Oak Tree. They could have ignored his email entirely. Then he would argue, well, they never gave me written instructions. They could have directed, they could have said, vote your conscience. I don't care. That's an instruction, and he could have voted. And they could have said, vote against the proposal that we've trumpeted. Completely absurd and illogical that that would ever happen. The whole reason for this merger was promoted, trumpeted, you know, and advocated for by Oak Tree. So counterfactual to think that would happen. And then the other two are they could have said, well, we want you to vote one way in favor of some of these proposals and against the others. And that, too, would have been completely illogical because it would undermine the whole purpose for the thing if Mr. Tannenbaum were given permission to or instructed to vote against one of Oak Tree's own proposals that needed his vote to, you know, with others to succeed. And so the final possibility was they could have said, you know, vote in favor of the proposals, which is what they did. And so just by asking, to conclude on that point, just by asking for the instructions is not itself volunteering to do it one way. He gave the option to Oak Tree. There's no serious factual dispute, you know, over the fact that they did instruct him, in fact, to vote in favor of the proposals. And when he did so, the plaintiff makes a big deal over the fact that, well, Mr. Tannenbaum's vote was needed to have the measures passed. But the fact is him just by knowing that he was going to – well, first of all, just by knowing that Oak Tree had instructed him to vote, that was not inside information, as they have also suggested, simply because it was obvious, as Judge Engelmeyer held, that, of course, the voting agreements were public. Oak Tree's position was public. So, of course, they're going to so instruct him. And secondly, his knowing that he was going to vote in favor is not knowing how the transaction is going to come out either, because his vote alone, although he was obviously a substantial shareholder of 13 and 20-something percent of the two respective entities, that's still less than 50. So he doesn't know how it's going to come, and who knows how the other votes are going to go. For those reasons, we respectfully submit he – his acquisition of the shares, which is the only element and only issue here, his acquisition of those shares in the merger were acquired involuntarily due to the legal obligations he had to vote their instructions and instructions that he was so given. So if you satisfy that element, as Judge Engelmeyer held, and then you have the second element that we discussed for the first half of my argument, that he did not have – they cannot show – plaintiffs cannot show that there was any – anything more than conjecture or wild speculation that Mr. Tannenbaum had access to any type of information that would have given him the potential for speculative abuse, because they haven't met that burden. Judge Engelmeyer found that the summary judgment standard was set – was met by Mr. Tannenbaum when we moved for summary judgment, and that therefore summary judgment was warranted in our favor. We qualified, Mr. Tannenbaum did, for the unorthodox transaction, safe harbor, and therefore the case should be dismissed. Okay. Thank you very much. Thank you. Ms. Talbot, you've reserved a couple of minutes for rebuttal. We've given both of you considerable time and access in the opening, which has been very helpful, but we're going to hold you to two minutes of rebuttal. Thank you. I just want to read you the cites that I promised to find. Please. Okay. So in the hop, we have this quote. There are no facts suggesting the existence of any antagonistic relationship between defendants and WPCS that would have precluded the possibility of incident information access by virtue of their greater than 10 percent ownership. So to me, that's the standard. In order to overcome that presumption, you show some evidence of hostility. Again, from At Home Corp. v. Cox Communications, also Second Circuit case, 2006. Current county controls when the insider is atypical as well as the transaction. So to me, that, and it says, this circuit has suggested that these factors, an involuntary transaction by an insider having no access to incident information, are prerequisites. So to me, that means show some evidence showing that you would have no access because you were adverse to management and management would have barred you from looking at anything nonpublic. Not that you were on friendly terms and call them on the phone and ask them for information and then not disclose it. The other thing is I would say that on the voting instructions, I just want to say that everyone agrees the written email is the important thing. If the email doesn't say to vote for the merger proposal, it doesn't say that. And if you look at the actual proxy, if you look at the proxy page, page A93 of your appendix books, and page A98 is a proposal for the acquiring company, you will see the voting instructions says please vote in favor of all three proposals. A93 is this page here. I'm just going to show it to you. You can see new proposals one, two, and three. None of these are the merger proposal. The merger proposal is on a separate page entirely addressed to shareholders of an entirely different company, the acquired company. So when they say all three proposals. What was the third one on the first page? I'm sorry. What was the third proposal on the first page? Oh, so it's the merger consideration proposal, which is dependent on the passage. It says right in the proposal this is dependent on the passage of the actual merger proposal. That was the approval of the merger stock issuance proposal. Stock issuance. Number three, right? Correct. Okay. And then the merger proposal is a separate proposal entirely. So when they say all three proposals, all I'm saying is it's at least a plausible reading to understand that to mean they refer to these proposals right here, one, two, and three. Whether they meant to or not. How about the third proposal being everything to do with the merger? Right, but the third proposal is addressed again. The third proposal is to effectuate the merger. I agree. But, again, it's two different companies, right? Only the acquired company has to vote on the merger. The third proposal on this, all of these three proposals were proposals sent to the acquiring company, who don't have to vote on the merger at all. If the merger is approved, then they vote on the merger consideration, right? All I'm saying is that's an ambiguity that should have been resolved by a jury and not by the court in summary judgment. Okay. Thank you very much to both of you. We kept you up a considerable amount of time. We'll take the case under advisement. Thank you.